1

```
 1                UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF NEW YORK
 2

 3      - - - - - - - - - - - -   X

 4    UNITED STATES OF AMERICA,    :      CR-93-0085

 5             Plaintiff,          :

 6            -against-            :

 7                                        United States Courthouse
                                          Brooklyn, New York
 8    PASQUALE CONTE,
      FRANCESCO GRAZIANO,
      ANTHONY VINCIULLO,          :
 9                                        May 20, 1994
               Defendants.         :      2:45 o'clock p.m.
10      - - - - - - - - - - - -   X

11

12                TRANSCRIPT OF CONFERENCE
               BEFORE THE HONORABLE I. LEO GLASSER
13               UNITED STATES DISTRICT JUDGE

14    APPEARANCES:

15    For the Government        ZACHARY W. CARTER
                                United States Attorney
16                              BY:  ANDREW WEISSMANN
                                Assistant United States Attorney
17                              225 Cadman Plaza East
                                Brooklyn, New York
18

19

20    For the Defendants        JAY GOLDBERG, ESQ.
                                 For Defendant Conte
21                               ROBERT KATZBERG, ESQ.
                                 LARRY BRONSON, ESQ.
22                               For Defendant Graziano

23                               JOEL WINOGRAD, ESQ.
                                 For Defendant Vinciullo
24

25
```

I hereby certify that the foregoing is a true and accurate transcript from my stenographic notes in this proceeding.

_____
Official Court Reporter
U.S. District Court

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★   AUG 15 2008   ★

BROOKLYN OFFICE

GR        OCR        CM        CSR

2

```
 1  Court Reporter:              Gene Rudolph
                                 225 Cadman Plaza East
 2                               Brooklyn, New York
                                 718-330-7687
 3
 4  Proceedings recorded by mechanical stenography, transcript
    produced by computer-aided transcription.
 5
 6
 7
 8          THE CLERK:  Criminal cause for status conference, USA
 9  against Pasquale Conte, Francesco Graziano and Anthony
10  Vinciullo.
11          Will the parties please step forward.
12          MR. GOLDBERG:  Good afternoon, Your Honor.
13          THE COURT:  Good afternoon.
14          MR. WEISSMANN:  Good afternoon, Judge.
15          THE COURT:  Good afternoon.
16          MR. KATZBERG:  Good afternoon, Your Honor.
17          THE COURT:  Good afternoon.
18          MR. WINOGRAD:  Good afternoon, sir.
19          THE COURT:  Good afternoon.
20          THE COURT:  Mr. Goldberg?
21          MR. GOLDBERG:  Your Honor, I don't know if you've had
22  a chance to look at a chart that I have prepared for you.  It
23  appears that the defendant Conte has placed as collateral for
24  the four million dollar bail that was set property that has
25  been appraised at ten million eight.  Considering the
```

1  encumbrances on the property, the appraisals placed the net

2  value at six point twenty-four million.  I don't know.  It is

3  the last -- do you have this sheet?  If Your Honor please?

4  Printed it out for you.

5          THE COURT:  Yes.

6          MR. GOLDBERG:  You have it, sir?

7          The defendant Conte would request the following, Your

8  Honor.

9          Nothing at this moment to be released, but what he

10 would like is -- there are negotiations with a bank or a

11 private lender.  If he's able to effect a mortgage on the

12 property that I have bracketed on the chart that I sent you

13 with my letter of May 18, 1994, if he's able to secure a

14 commitment for a four hundred thousand dollar mortgage on that

15 property, on Knickerbocker Avenue, he would like permission to

16 incumber that property with a four hundred thousand dollar

17 mortgage, leaching the equity in that property at, oh, one

18 million two hundred and fifty.  Its present equity is one

19 million six hundred and fifty.  You will find it at page 4, if

20 you have that in front of you.  It is page 4.

21         We would expect that within the next week -- two

22 weeks if we are able with a lender to secure possibility of

23 those funds, we'd have to incumber the property by four

24 hundred thousand dollars, adding to the mortgage presently

25 existing there in added incumbrance.

1          We wanted to discuss with you the Court's attitude.

2    I don't ask for the release entirely of the collateral, even

3    though it appears -- obviously a request to get the defendant

4    out when Your Honor graciously granted bail, the properties

5    exceed the four million dollars that was placed as the amount

6    for the defendant's bail.

7          This is a motion to modify the terms of the

8    defendant's bail conditions, to permit on the Knickerbocker

9    Avenue property on page 4 of the chart handed up an added

10   incumbrance in the amount of four hundred thousand and then

11   return the rest to the bail package.

12         THE COURT:  Mr. Weissmann?

13         MR. WEISSMANN:  The government's position is twofold.

14         First, at the outset, we had both times that the

15   Court visited the issue of bail, we didn't think that this

16   amount of property even with the four million dollars was

17   sufficient to secure the defendant's presence, so just on that

18   basis alone we continue to object and, of course, anything

19   less than four million dollars we would say is still

20   insufficient to secure his presence.  On that technical basis

21   we would object to it.

22         And the only other basis is that the defendant's

23   proffered reason for wanting -- needing to do this, we just

24   don't believe, which was that this is his only source of

25   income.  In other words, when the request was made to us it

1  was stated that in fact, all of his assets are -- have been

2  posted and so he needs four hundred thousand dollars and

3  because he has to get it from this property that he's making

4  this application and since we don't believe that, we can't

5  consent to his request.

6          MR. GOLDBERG:  Sir, may I just point out that I think

7  Mr. Weissmann may not understand my application.  I am not

8  seeking a four million dollar -- a reduction by -- from four

9  million to three six.  I am not seeking that.  I am seeking in

10 effect to ask the government instead of holding six point two

11 million to secure the four million dollars, I'm asking them to

12 hold five, whatever the arithmetic is, five eight to secure

13 the four million.

14         I am not seeking a reduction of -- although I mean

15 quite frankly, our position would be three point six would be

16 enough to secure his presence, but that's not for me to say.

17 You have ruled that four is the figure.  So I don't want to

18 get into that.

19         But I am not asking for a reduction in the amount.

20         THE COURT:  Who owns that property?

21         MR. GOLDBERG:  Flatridge Realty Associates.  Do you

22 want to know the principals?

23         THE COURT:  No.

24         MR. GOLDBERG:  That's on page 4, Your Honor.

25         THE COURT:  Why don't you turn to the preceding

6

1   page?

2           MR. GOLDBERG:  Preceding page?

3           THE COURT:  293, 299 Knickerbocker Avenue?  Block

4   3220, lot five, Conte Realty Associates.  Who are they?

5           MR. GOLDBERG:  Yes.

6           MR. BRONSON:  Could we have --

7           MR. GOLDBERG:  Would you permit Mr. Conte, Anthony

8   Conte, to respond?  You want to know, it appears to me, that

9   it's the same parcel of property.  Isn't it?

10          MR. A. CONTE:  Yes.

11          MR. GOLDBERG:  Why is it listed twice?

12          MR. A. CONTE:  Your Honor, the properties were

13  originally purchased in separate partnerships.  Then

14  combined.  There were five lots.  It was combined into one

15  lot, lot five.

16          MR. GOLDBERG:  How does that differ from page 4?

17          MR. A. CONTE:  Well, half of it was owned by Conte

18  Realty and half of it is owned by Flatridge Realty

19  Associates.

20          THE COURT:  What half is owned by whom?

21          MR. A. CONTE:  293, 2935 Knickerbocker and rear

22  building 276 Suydham Street is owned by Flatridge Realty

23  Associates.  295 Knickerbocker and 827 Hart Street are owned

24  by Conte Realty Associates.

25          THE COURT:  Why has it been listed this way?

1          MR. A. CONTE:  293 is on -- on page 3, the 293 is

2    incorrect.  The 299 and the 827 Hart Street are owned by Conte

3    Realty.

4          The attorney prepared it.  There is an error here.

5          MR. GOLDBERG:  What should it be?

6          MR. A. CONTE:  The correct, the correct way is

7    Flatridge Realty owns 293, 295 Knickerbocker.

8          MR. GOLDBERG:  Wait a minute.  293 and 295

9    Knickerbocker.  Take out 299?

10          MR. A. CONTE:  Correct.

11          And 276 Suydham also.

12          MR. GOLDBERG:  But not Hart?

13          MR. A. CONTE:  Correct.

14          MR. GOLDBERG:  All right.

15          MR. A. CONTE:  The 299 Knickerbocker and 827 Hart are

16    owned by Conte Realty.

17          MR. GOLDBERG:  Hart?

18          MR. A. CONTE:  299, cross out 293.  299 Knickerbocker

19    and 827 Hart.

20          MR. GOLDBERG:  Cross that out?

21          MR. A. CONTE:  Yes.

22          MR. GOLDBERG:  Cross out 827 Hart?

23          MR. A. CONTE:  No.  Suydham.  I'm sorry.

24          MR. GOLDBERG:  Oh.  What's this number?

25          MR. A. CONTE:  827.

8

1          MR. GOLDBERG:  827.

2          Does the record reflect that on page three, Conte

3    Realty Associates owns 299 Knickerbocker Avenue and 827 Hart

4    Street, and on page 4, Flatridge Realty owns 293 and 295

5    Knickerbocker Avenue, and 276 Suydham Street.

6          THE COURT:  The last appraisal on these properties

7    was 1990?

8          MR. A. CONTE:  Yes.

9          THE COURT:  Is there a current appraisal?

10         MR. A. CONTE:  That's the most recent one.

11         THE COURT:  How long would it take to get a current

12   appraisal?

13         MR. A. CONTE:  I would guess probably two weeks.

14         THE COURT:  What else?

15         MR. GOLDBERG:  What's that?

16         THE COURT:  What else?

17         MR. GOLDBERG:  Nothing else.

18         THE COURT:  Do you have some other applications that

19   you are making?

20         MR. GOLDBERG:  Yes.

21         Do you mind if I jump to item three?  That's the -- I

22   just wanted to deal with that Exhibit B.  That's something

23   that came up in our trial and I would need a good deal of

24   advance notice to get these people here.  I wanted to put into

25   evidence material that was placed into evidence in the Gambino

GR        OCR        CM        CSR

1   case.   The record speaks for itself.   I have marked it as

2   Exhibit B.

3          I didn't give you the exhibits, other than the

4   transcripts, but I can hand them up.   They were -- this is the

5   exhibit that went into evidence and I have in my mind.   I did

6   give them to Mr. Weissmann.

7          Exhibit J that went in to evidence on Mr. Rosen's

8   proffer showing Gravano's trip which is central to our case,

9   in April of 1990, is with -- with Gammarano is a set of

10  documents that we would ask be placed into evidence.

11          When I raised it at the trial I thought it came in in

12  cross-examination.   Mr. Gleeson during the luncheon recess

13  said he couldn't find it in the cross examination.   He was

14  right.

15          It went into evidence sometime later on, and I have

16  given you the page references.   I just want to know if there

17  will be any problem with these documents if they --

18          THE COURT:   Mr. Weissmann?

19          MR. WEISSMANN:   The government's position is that

20  we -- we probably will have -- will continue objecting on

21  relevance grounds, but if the concern right now is whether

22  counsel is going to have to bring people from American Express

23  or the Hyatt to authenticate these as business records, we are

24  not going to require that.   We will be able to stipulate that

25  these are authentic documents or business records, but I think

1  we should visit the issue of relevance at the time of the

2  trial, but we certainly are not going to require counsel to

3  bring someone from the Hyatt Regency or American Express.

4        MR. GOLDBERG:  That's good enough for me.

5        I will withdraw any other application on it at this

6  point and say that relevance perhaps should be dealt with at

7  the time during trial, when I can make a showing of their

8  relevance.

9        I just wanted to know about authenticity.  That's

10  satisfactory.

11        In all respects, I withdraw any further application

12  on this exhibit.

13        The last item that I will deal with will be my letter

14  to Mr. Weissmann on April 5 to which there was no response

15  from the government.  It is Exhibit C in the package that I

16  have given you, Your Honor.

17        It has come to our attention that purportedly

18  Mr. Gravano had a close working relationship with Anthony

19  Casso.  I think they were involved in the importation of ten

20  thousand pounds of cocaine, in a boat, and a host of other

21  instances of wrongdoing, and I just want to alert the

22  government to the need, in my view, for obviously

23  conversations with Mr. O'Connell and Mr. Rose because I think

24  that there is a host of -- additional Brady material that's

25  Giglio material -- in the hands of the government, having to

1    do with Gravano.

2         I did speak to Mr. Weissmann and he said that the

3    government is aware of its obligations, but I just wanted to

4    make sure that every -- that we are on the same wavelength

5    with what those obligations were, and I just don't want to be

6    in a situation following a verdict, if it is against the

7    defendants, of arguing probabilities, how it might have

8    affected the verdict, or it could have affected.

9         It is best if it is turned over now and if there is

10   any problem to perhaps submit it in camera to Your Honor.

11        But I think that Mr. Casso has a great deal of

12   impeachment material with respect to Gravano, who is critical

13   in this case.  He's the only witness that the government

14   called with purported direct knowledge and I wanted to get

15   behind the government's declaration, that they are aware of

16   their obligation, because I just don't know that I'm satisfied

17   with that, although of course the courts may and often courts

18   are, but I just want the record to reflect the specific demand

19   that I am making.

20        THE COURT:  Mr. Weissmann?

21        MR. GOLDBERG:  And during the trial -- it's item one

22   on my Exhibit C, item two in the second paragraph, is

23   following the trial Mr. Bronson demanded copies of all video

24   surveillance tapes made of activities in the Ravenite.  The

25   entire period of the surveillance.

1          We do that because we were not satisfied with the

2   government's composite.  We felt that it was highly selective

3   and unfair, particularly as an example December 24, 1989,

4   outside of the Ravenite.

5          It is my understanding, although I have no direct

6   recollection myself, that these demands of Mr. Weissmann were

7   made following the trial.  When this was brought to my

8   attention on April 5, I wrote a letter to the prosecutor, and

9   have not received a response.

10          And finally, during the course of the trial, we were

11   provided surveillance logs of the video surveillance.  We now

12   request the complete logs on each and every occasion that any

13   of the defendants was the subject of that video surveillance.

14          I certainly think if the defendants or any of them

15   were observed at the Ravenite, in addition to the video

16   surveillance, we should be entitled to the logs on those

17   occasions to see what they reflect.

18          And that is the end of my proffer under Exhibit C to

19   my letter to the Court dated May 18.  Mr. Katzberg will

20   address two items, one will be -- to find out from Your Honor

21   how you contemplate jury selection and, two, our request for a

22   rescheduling of the case.

23          Can I turn that over to Mr. Katzberg?

24          THE COURT:  Mr. Weissmann, do you want to address or

25   respond to Mr. Goldberg's statements with respect to Brady and

1  his discovery request?

2          MR. WEISSMANN:  Yes, Judge.

3          With respect to Brady, and specifically I am focusing

4  on their request that we be assured that there is no Brady

5  material with respect to Mr. Casso, we have already started to

6  look into that matter.  As I told Mr. Goldberg, and if we find

7  Brady material with respect to that, with respect to any other

8  matter, we will turn that over, and if we have any questions

9  about it, we will provide it to the Court in camera so that

10  the Court can examine the material.

11          With respect to video surveillance, that's -- where

12  they have requested all video surveillance of the Ravenite for

13  every single day, what I have told counsel is -- we will make

14  all of those video surveillances available to them at the FBI

15  and they can look through all of the video surveillances of

16  every single day at the Ravenite, if they choose to do so and

17  they can just call me and I can set up a time that's

18  convenient for the FBI and for counsel.

19          With respect to the surveillance logs, I believe we

20  have litigated this.  We have turned over specific logs when

21  we have been requested and given a reason for specific logs or

22  it is shown to us why it would be at all material to the

23  defense.  I remember Mr. Katzberg raising this with respect to

24  specific days that did seem to be material and we turned those

25  over.

1          If the request now is simply a flat request for all

2   logs on any day that the defendants are present, which is

3   considerable number of days, we would stand by our brief when

4   this was litigated, which is that they are not entitled to

5   that.

6          Of course, it could be 3500 material for an agent if

7   they were to testify.  There would be a different reason why

8   we'd have to disclose it, but if there is -- if the request is

9   as it stands, which is simply just a request that they want

10  it, we believe that we are not required under discovery rules

11  to turn that over.

12          THE COURT:  Is this a matter which I had ruled on

13  before?

14          MR. WEISSMANN:  I believe so.  I tried to check that

15  before I came today but I haven't been able to go through the

16  entire record to see -- I believe -- I thought everything will

17  be ruled on.  I certainly know this is something that was

18  raised in the pretrial motions.

19          I can only say I assumed that it had been because

20  what we ended up doing during the trial is specific requests,

21  where there was some reason articulated for it, we turned

22  those surveillance logs over.

23          THE COURT:  If I've already ruled on it once, I don't

24  see any purpose to go through it again.  Unless I could be

25  convinced that my ruling, my earlier ruling was wrong on some

1  basis or for some reason.

2      Why don't you check that out first before we do

3  anything else as to that?

4      If there was the same request made before and I have

5  ruled on it before, I don't see any purpose to revisit it,

6  unless a motion is made to reconsider my prior ruling and a

7  motion will be that I have overlooked some controlling

8  principle of law or some significant fact, which is what the

9  standards are with respect to motions to reconsider.

10     If I haven't ruled on it before, you say there is a

11  brief on it?  Is there a written request?

12     MR. BRONSON:  Judge, may I?

13     During the pretrial stage, Your Honor did rule on

14  it.  However, during the course of the trial, Your Honor

15  varied his ruling and did in fact turn over complete

16  surveillance logs for I believe one or two days, which there

17  became an issue in the trial as to those days on the

18  cross-examination.  So you did turn -- you did require the

19  government to turn over the complete surveillance logs for --

20  I believe it was two days, which was the particular request

21  during that cross-examination.

22     THE COURT:  So I have ruled on it then.  The

23  government turned over what it is I told them to turn over and

24  with respect to the others, I denied the request, is that the

25  idea?

1          MR. BRONSON:  Well, there was not a request for the

2    balance of the logs during the course of the trial after Your

3    Honor had considered the fact that the complete logs would be

4    useful in the cross-examination of the agent who was

5    testifying with respect to the video tapes.

6          THE COURT:  I am really not sure that I understand

7    what you are telling me.  Was there or wasn't there a request

8    for all the logs which would reflect the days on which these

9    defendants were present at the Ravenite?  Yes or no?

10         MR. BRONSON:  Yes, pretrial.

11         THE COURT:  I ruled on that pretrial?

12         MR. BRONSON:  That is correct, sir.

13         THE COURT:  I denied it pretrial, except for those

14   two days.

15         MR. BRONSON:  Yes.

16         THE COURT:  Is there any reason why I should change

17   that ruling?

18         MR. BRONSON:  During the course of the trial, I

19   believe when a request was made for particular days, which

20   were of tapes which --

21         THE COURT:  The point of the matter is, I have made

22   rulings.  I said they are not entitled to all the logs which

23   reflect the defendant's presence at the Ravenite but I

24   modified that ruling and said you were entitled to the logs

25   for the two days which were in question at the time and which

GR          OCR          CM          CSR

1   I thought were relevant and therefore directed the government

2   to turn it over. But with respect to all the other days, I

3   have ruled on that.

4           MR. BRONSON: The request now would be for those days

5   which were part of the composite which the government played

6   during the first trial because Your Honor saw fit to give

7   us --

8           THE COURT: Excuse me.

9           Did you hear what I just indicated?

10          MR. BRONSON: Very clearly.

11          THE COURT: Is what I said accurate?

12          MR. BRONSON: Absolutely.

13          THE COURT: The next question I have is, is there any

14  reason why I should change that ruling?

15          MR. BRONSON: Well, what I would like the opportunity

16  to do, Your Honor, is pull out the transcript and refer you to

17  your actual ruling so we can reflect on it and then you can

18  make a decision after that.

19          THE COURT: The actual rulings were two. One ruling

20  was to deny your request initially, and the second ruling was

21  to grant it with respect to two days that were in question.

22          MR. BRONSON: That is correct, sir.

23          THE COURT: Is there any reason why I should change

24  those rulings?

25          MR. BRONSON: The --

1          THE COURT:  That's the question I'm asking.  Is there

2   some significant fact or controlling principle of law that I

3   have --

4          MR. BRONSON:  Yes.  I believe, Your Honor, when you

5   had the opportunity to view the composite and saw the need for

6   the entire surveillance log to be used for the particular day,

7   that was the basis for your ruling.

8          We did not at that time go into all the particular

9   days which were the subject of the composite which was played

10  to the jury.

11         THE COURT:  With respect to the composite that was

12  played to the jury, am I correct in stating that during the

13  time that the composite was played, there was an FBI agent on

14  the stand who was identifying the persons who appeared in the

15  composite?

16         MR. BRONSON:  That is correct, sir.

17         THE COURT:  Therefore, the material which you are

18  requesting, that is, logs, which pertain to those days which

19  were indicated on the composite would be 3500 material?

20         MR. BRONSON:  That is correct.

21         THE COURT:  To which you would be entitled.

22         MR. BRONSON:  The complete logs were not turned over

23  as part of 3500 material.  When I talk about -- the government

24  made a summary log.  They did not give us the entire log for

25  the entire day, but after argument on it and after the

1   production of one, Your Honor viewed those complete logs as

2   necessary for the -- or necessary and helpful for the

3   cross-examination.

4           So what we are seeking to do is to extend that to all

5   those days which were part of the government's composite.

6           It would also be helpful, Your Honor, in our review

7   of the actual surveillance tapes at the FBI headquarters.

8           THE COURT:  Why don't you make your request in

9   writing as a formal discovery request.  Let the government

10  respond to it.  I am frank to say that I am not quite sure I

11  understand what it is that you are asking for.

12          MR. BRONSON:  Fine.

13          THE COURT:  I am not quite sure I understand your

14  response to the question I asked.  Namely, whether or not

15  there is any reason for me to change a ruling which I made

16  earlier with respect to the precise requests that you are

17  making now.

18          MR. BRONSON:  Fine.

19          MR. GOLDBERG:  Judge, may I just add something that

20  came up?  It may be outside the agenda but if you can deal

21  with it.

22          I have been trying to get the payroll books of Mario

23  DiBono, DiBono, Louis DiBono's company, and to find a

24  particular employee, and I have been told, and I am not sure

25  this person really knows, I have been told the government has

1    the records of DiBono's business.

2           I would like access to the books and records, payroll

3    records of DiBono Drywall Company.

4           THE COURT:  Before you go any further, Mr. Goldberg,

5    I am not terribly comfortable in making rulings by the seat of

6    my pants.

7           MR. GOLDBERG:  Okay.

8           THE COURT:  I am not terribly comfortable in making a

9    ruling with respect to the request you make having no idea as

10   to whether the assumptions upon which the requests are based

11   are accurate.

12          Number two, I have no idea as to whether or not the

13   request is one which is a request which ought to be granted

14   because the material you are seeking is in some way relevant

15   for the preparation of your defense.

16          MR. GOLDBERG:  Okay.

17          THE COURT:  And not knowing any of that and those are

18   the two, seems to me, significant pieces of information which

19   I ought to have in order to make an informed ruling, why don't

20   you make a formal application and set forth the basis upon

21   which you make your requests.

22          I think I made some indication earlier that a lot of

23   time could be saved and a lot of unnecessary wrangling and

24   hyperbole would be saved if proceedings were conducted in a

25   rather formal lawyerly fashion and not walk in here from time

1   to time and make these requests which you ask me to rule on by

2   the seat of my pants, without the basis of some knowledge as

3   to what the requests are based on.

4           MR. GOLDBERG:  All right.  I withdraw that.

5           THE COURT:  I don't think it is appropriate.

6           MR. GOLDBERG:  Good enough.

7           THE COURT:  For me to deal with requests on that

8   basis.

9           Mr. Katzberg.

10          MR. KATZBERG:  Yes, Your Honor.  Just briefly, if I

11  might?

12          At the close of the trial, we requested from the

13  government based upon our concern as to the fairness of the

14  composite and for other issues concerning the surveillance

15  videos, we requested that we have access to all of the

16  surveillances, however voluminous they may be.  That request

17  was followed up by Mr. Goldberg on his April letter, Exhibit

18  C, to the papers he submitted this afternoon.

19          Now that we have access to those videos, and I would

20  be the first to admit that we should have followed up on this

21  sooner, I would request that Your Honor give us some

22  additional time within which to view those videos.  It is a

23  substantial task, without doubt, but, unfortunately, one that

24  we come to the conclusion is necessary for the following

25  reasons.

1      DiBono --

2          THE COURT:  Is this in connection with the request

3   for an extension of time for trial date?

4          MR. KATZBERG:  Yes, this is, I should have labeled

5   it, I'm sorry.  This is a request to extend the trial date to

6   some -- at the earliest convenience of the Court and counsel

7   sometime in the fall.  September, October, whatever it may

8   be.

9          Essentially really, that is the dilemma that we

10  have.  DiBono, his accessibility, both to Gotti and to two of

11  the three defendants on trial, that is, Mr. Graziano and

12  Mr. Conte, are really very much at the heart of the dispute

13  that is at the center of this trial.

14         If, for example, as the government would have the

15  jury believe, Louis DiBono was impossible to find, did not

16  come in, and neither Gotti nor Graziano and Conte had access

17  to him, then that goes a long way to corroborate the story

18  that Mr. Gravano is telling.

19         If, on the other hand, the opposite is true, that is

20  to say, that Mr. DiBono was available, was at the Ravenite,

21  and was subject to being spoken to, was subject to -- was

22  accessible for this hit that eventually took place some many

23  months after the conversations that are reflected in the

24  Ravenite tapes, then that obviously is something that is very

25  helpful to the defense because we believe that it seriously

1    undermines the Gravano position and seriously undermines his

2    believability and undermines the prosecution's case.

3         This is at the very core, and as I'm sure Your Honor

4    will remember probably better than I do, this was at the very

5    core of the battle that was going on to a very large extent in

6    terms of DiBono and what Mr. Gravano said about DiBono.

7         DiBono went to great lengths, I recall, a

8    photograph of the house that DiBono purchased on an island

9    somewhere in the water so he would be in this protected

10   position and therefore inaccessible.  So much of Gravano's

11   testimony was concerning the attempts to find Gravano --

12   DiBono.  Indeed, the very tapes that are the beginning tapes

13   of the Ravenite intercepts, the one involving my client

14   Mr. Graziano, about attempts to locate Louie, where is Louie,

15   this is really a fundamentally essential issue that the

16   defense at least has to grapple with.

17        In that regard, we believe that the composite which

18   was shown, particularly that December 24 date, that Christmas

19   tape of DiBono sort of standing by himself and all of those

20   kinds of things, the government did this for a reason, because

21   it was important to their case.

22        For the same reason that it is important to us, to

23   try to show the question of accessibility, and the question of

24   accessibility goes beyond the narrow issue of DiBono being at

25   the Ravenite.  It goes to the number of times Mr. Graziano and

1   Mr. Conte are at the Ravenite.  It is even helpful from your,

2   from our point of view to know which dates there were

3   walk-walks and which dates there are not walk-talks.

4          All of this is something which we believe having

5   learned from the first trial, so to speak, would be very

6   helpful to us in a second trial.  We don't think Mr. Gravano

7   is going to be changing his story.  We don't believe the

8   government is going to be changing its theory of its case.

9          So we think that it would be important for us to

10  really take the time to look at these things, and as I said

11  before, I would be frank to admit, we should have followed up

12  on our initial request in February, not in April, and there

13  is -- there is nothing beyond that that I can say to the

14  Court.

15          THE COURT:  You mean April?

16          MR. KATZBERG:  Sorry?

17          THE COURT:  You mean May.

18          MR. KATZBERG:  No.  We made the follow-up request in

19  April.  April the 5th.  That's the last --

20          THE COURT:  What happened?

21          MR. KATZBERG:  We haven't gotten a response.

22          THE COURT:  Why have you waited until May 20?

23          MR. KATZBERG:  That's what I'm saying, I would be the

24  first to admit, although maybe I am the second now, I would be

25  the first to admit that we should have been more vigorous in

GR        OCR        CM        CSR

1  pursuing this.  Nonetheless, it is something that is

2  significant and we would ask the Court to give us the time now

3  that it has been afforded to us.  However substantial the task

4  may be of going to the FBI, of sending down people and

5  rotating, however we do it from a man hour point of view, to

6  look at these things, and to make sure that we have done what

7  we really think we should be doing in this regard.

8         So on that basis I would ask Your Honor, if it is

9  possible, convenient to Your Honor's schedule, and of course

10 consistent with the government's availability, to put this

11 case over until September or October or whenever it is

12 available.  Certainly, I will do everything within my power in

13 terms of my trial schedule to make myself absolutely available

14 to a convenient date.

15         THE COURT:  Does the government want to be heard.

16         MR. WEISSMANN:  Yes, Judge.

17         Addressing first the merits of the argument, frankly,

18 I am at a loss to understand Mr. Katzberg's argument as to the

19 merits of it.  If the argument is that Gotti and Gravano were

20 accessible because they were always at the Ravenite, they have

21 that information.  If they need to know that DiBono was

22 accessible because he was at the Ravenite, we have turned over

23 every single day that DiBono was at the Ravenite.  They have

24 that already.

25         So I am not -- I am just not sure what it is about

1  these additional video surveillances that they hope to

2  obtain.  I just don't understand the argument.

3       But even without going to the merits, there is the

4  issue of why is it that defense counsel didn't do this

5  sooner.  We've already been through a trial.  If they really

6  thought this was something that was so critical to their

7  defense they could have done it before the trial.  They

8  certainly can do it now.

9       They know that people made this request.  We have --

10  which frankly we don't see why they need it.  If they want to

11  go to the FBI and look at them, they can go ahead and do it.

12       I think it is somewhat -- I am really at a loss as to

13  whether this is really the reason why they are seeking a

14  delay.  I have asked counsel before we got here today whether

15  there was any reason they were going to speak to put off the

16  trial.  I wasn't -- certainly wasn't given this as an answer.

17       This is the first time I've ever heard this as an

18  answer, and there is prejudice to the government.  I have a

19  six-week trial starting September 7th before Judge Nickerson.

20       THE COURT:  Well, I guess I should have been a little

21  bit more forthright and have indicated in advance, having

22  asked for the government's response was really rhetorical.

23       My trial schedule between now and December is pretty

24  heavy.  We have scheduled rather significant trials for

25  September, October, and I will be here for a good part of

1   July.

2           June 6 -- 26, is that the date?  June 26.  I don't

3   want to comment upon why you didn't do this sooner.  I don't

4   think it serves any useful purpose.

5           But those composites and all the evidence with

6   respect to this were the subject of a lot of examination,

7   inquiry, long, long time ago.

8           MR. KATZBERG: Sure.

9           THE COURT:  I'm sure all these significant issues

10  that you wish to explore are not occurring to you for the

11  first time.

12          MR. KATZBERG:  No, sir.

13          THE COURT:  I'm sure they have occurred to you a long

14  time ago.

15          MR. KATZBERG:  Since the trial, sir.

16          THE COURT:  Sure.

17          And during the course of the trial as well.

18          In any event, it is neither here nor there.

19          June 26.  What else?

20          MR. GOLDBERG:  Sunday is the 26th.

21          THE COURT:  27.  Whatever the date is.

22          MR. KATZBERG:  May I touch upon the jury selection

23  issue?

24          THE COURT:  Yes.

25          MR. KATZBERG:  Which is the last issue on my agenda.

1          We would request the same individual voir dire that

2    we had the last time, with the utilization of the

3    questionnaires.  I don't think that the questionnaires have to

4    be altered at all.  I think they were well honed to the issues

5    that were involved then and are well honed to the issues that

6    will be involved now.  If there are any changes or additions

7    or deletions we can obviously address that but that would be

8    our request.

9          THE COURT:  Does the government have something they'd

10   like to say in response?

11         MR. WEISSMANN:  No.

12         My recollection is that I think there was one

13   addition or one -- as we experienced how the questionnaires

14   were being filled out, there was one problem we noted which I

15   can't remember off the top of my head but I will go back and

16   look at it.  If there is something that we think should be

17   changed, we will write the Court and counsel immediately.

18         THE COURT:  I am rather ambivalent about the whole

19   jury selection process.  I want to reexamine it.  I will let

20   you know certainly no later than next week.  I'd like to

21   review the questionnaire again and let me review the whole

22   process again in my own mind.

23         I don't recall how long it took us to pick the jury

24   last time.  About two days?

25         MR. WINOGRAD:  Three days.

1       MR. KATZBERG:  Two days and change.

2       THE COURT:  Yes.  But I think there was a week before

3 where we reviewed questionnaires.  At least three or four

4 days.  We went over questionnaires, separately.  Each of you

5 went over questionnaires which were prepared for you.

6       MR. KATZBERG:  Yes.

7       THE COURT:  I went over all the questionnaires.  We

8 indicated I think separately questions which required some

9 follow-up, and I think that took about a week, maybe two or

10 three days.  I don't recall precisely.  It took additional

11 time as well.

12       If -- if I decide to do what we did before, I'd like

13 to consider getting a big jury panel in before the 27th.

14 Maybe a week before that.

15       THE CLERK:  Yes, Your Honor.

16       THE COURT:  To have them begin filling out

17 questionnaires so we can start the jury selection process on

18 the 27th without first starting to fill out questionnaires and

19 then not really getting started until the following week,

20 which would bring us into July 4.

21       I have trials I think for July, August, calendared

22 things for September, October as well.

23       THE CLERK:  Yes, you do.

24       THE COURT:  So if I do that, that's what we will do.

25       MR. KATZBERG:  One last --

1      THE COURT:  I'm sorry?

2      MR. KATZBERG:  Is -- one last request.  Your Honor

3  and Mr. Bronson had a conversation about filing formal

4  motions.  Does Your Honor want to set a schedule by which any

5  additional formal motions should be filed with the Court in

6  anticipation of the trial date?  Because there may be things

7  that we think of --

8      THE COURT:  I'd like all motions filed at least ten

9  days before trial.

10      MR. KATZBERG:  Fine, sir.

11      THE COURT:  With respect to these other matters that

12  you are bringing up, I don't see any need to give you a

13  specific deadline.  It is just that I don't feel comfortable.

14      MR. KATZBERG:  I appreciate that.

15      THE COURT:  -- in these ad hoc kind of rulings, where

16  I may be doing an injustice to you, to the government, perhaps

17  to the process, asking for material which I don't know whether

18  the government has DiBono's payroll records.  If they don't

19  have his payroll records, direct them to turn it over, may be

20  directing them to do something which they can't do.  Aside

21  from which, if they do have the payroll records, I don't know

22  why I should direct them to turn them over to you, the

23  relevance of those payroll records to any issue in this case.

24      MR. KATZBERG:  All right, sir.

25      THE COURT:  I don't know any of that now.

1          MR. KATZBERG:  Hopefully we can put together --

2          THE COURT:  I don't think you'd like me to walk into

3    your office and say, Mr. Katzberg, I'd like you to direct X to

4    turn over a box full of material.  I think you'd want to know

5    why.

6          MR. KATZBERG:  I would hope I would want to know why.

7          THE COURT:  I should hope so.

8          With respect to -- with respect to the request, I'd

9    like a current appraisal of that property.

10         MR. GOLDBERG:  Current?

11         THE COURT:  I don't know what's happened to that

12   area.  It may be the property is worth half of what it was

13   worth in 1990.  I have no idea.  I'd like to see a current

14   appraisal on that.

15         MR. GOLDBERG:  We will do that.

16         THE COURT:  Thank you.

17         MR. WINOGRAD:  Your Honor, I made one request with

18   respect to the mortgage but I have spoken to the government

19   about it and they have consented to a process where the

20   defendant Vinciullo's son can withdraw a hundred thousand

21   dollars in equity from the mortgage and keep it the same for

22   the bail conditions that were set previously.

23         THE COURT:  I don't have those conditions clearly in

24   mind.  But what's this all about?

25         MR. WEISSMANN:  Well, Mr. Vinciullo requested that

1  the equity that he posted to secure a million dollar bond be

2  reduced by one hundred thousand dollars.  Mr. Vinciullo had

3  various relatives post three separate houses, and given the

4  security that's there already, we don't think that, in our

5  opinion, that the hundred thousand dollars in security would

6  pose a measurable difference in terms of the risk of flight.

7          THE COURT:  So ordered.

8          MR. WINOGRAD:  Thank you.

9          THE COURT:  What else?  Anything else?

10         MR. KATZBERG:  No, sir.

11         THE COURT:  Okay.  I will let you know next week.

12         MR. KATZBERG:  Thank you, Your Honor.

13         THE COURT:  With respect to the jury problem.

14         MR. KATZBERG:  Yes.

15         THE COURT:  I think that was an anonymous jury too,

16 wasn't it?

17         MR. WEISSMANN:  Yes.

18         MR. KATZBERG:  Yes, sir.

19         THE COURT:  The indictment is the same?

20         MR. WEISSMANN:  Yes.

21         THE COURT:  There has been no change?

22         MR. WEISSMANN:  No.

23         THE COURT:  Okay.  Anything else?

24         MR. KATZBERG:  No, sir.

25         THE COURT:  Thank you.

1        MR. KATZBERG:  Thank you, Your Honor.

2        Good afternoon.

3        THE COURT:  Good afternoon.

4        (Whereupon this matter was concluded for this date.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

GR          OCR          CM          CSR